**Elaine Whitfield SHARP and Dan Sharp, Plaintiffs,**

v.

**Sheriff Arthur T. KELSEY; Officer Randy M. Carpenter; Officer Michael J. Baird; Officer Steven Kiboloski; and Officer Dan Easter, Defendants.**

**No. 5:94:CV:169.**

United States District Court, W.D. Michigan.

March 13, 1996.

Louis J. Porter, Joseph R. Assenzo, Hill, Lewis, Adams, Goodrich & Tait, Lansing, MI, Daniel S. Sharp, Whiteifle, Sharp & Sharp, Marblehead, MA, for Elaine Whitfield Sharp, Dan Sharp.

James L. Dyer, Cummings, McClorey, Davis & Acho, PC, Battle Creek, MI, for Arthur T. Kelsey, Randy M. Carpenter, Michael J. Baird, Steven Kiboloski, Dan Easter.

### *PARTIAL JUDGMENT*

ENSLEN, Chief Judge.

In accordance with the Opinion entered on this date;

**IT IS HEREBY ORDERED** that defendants' motion to dismiss or for summary judgment (dkt. # 20) is **GRANTED in part** and **DENIED in part**;

**IT IS FURTHER ORDERED** that the motion is **GRANTED** so for as all defendants are entitled to **JUDGMENT** on all Fourteenth Amendment claims and the Fourth Amendment claims of excessive force and unlawful seizure, and Sheriff Kelsey is entitled to **JUDGMENT** on the failure to train theory of liability.

**IT IS FURTHER ORDERED** that the motion is **DENIED** with regard to the Eighth Amendment claim lodged against the officer defendants, and with regard to the Eighth Amendment deliberate indifference/supervisory liability claim lodged against Sheriff Kelsey, as well as with regard to the state claims.

### *OPINION*

This matter is before the Court on defendants' motion to dismiss or for summary judgment. Plaintiffs are husband and wife attorneys. Defendants are the Sheriff and Officers of the Eaton County Sheriff's Department.

### FACTS

The case regards events which occurred shortly after plaintiff Elaine Whitfield Sharp, an attorney, was held in contempt by the Honorable G. Michael Hocking, a state judge.

Ms. Sharp appeared before Judge Hocking on a custody matter. The judge ruled against her, and she began to talk over and argue with him. The arguing continued through several warnings from the judge that he would hold her in contempt if she did not cease. She questioned his judgment and knowledge of the law. The judge tolerated no more, summarily judged Ms. Sharp guilty of criminal contempt, sentenced her to a fine and five days in jail, and ordered Officer Baird to take her away. The judge and Ms. Sharp each had questioned what planet the other was from.

In accordance with the judge's order, Officer Baird escorted Ms. Sharp out a door at the side of the bench. The complaint alleges that Ms. Sharp went out the door peacefully. Once out the door, Officer Baird shoved her toward what appeared to be a cell. She retraced her steps from the shove, and asked why she was being pushed to a cell. She thought she only needed to pay a fine. Officer Baird said "You're done, lady", and punched her in the breasts so hard that she fell to the ground and struck her head against the wall or door of a neighboring courtroom. He then dragged her off the floor as she struggled to get to her feet. Ms. Sharp's complaint explains that she staggered back into Judge Hocking's courtroom, only to have Officer Baird grab her and take her back out of the courtroom again. He slammed her against a wall just outside of the courtroom, held her by the hair, and placed his knee in her back while he opened the cell door. When he opened the door, he shoved her through and then slid her briefcase in after her. Officer Baird then entered the cell and came toward Ms. Sharp in an intimidating manner. Grasping a set of keys in her fist, she raised her fist and keys toward the officer and declared that she would defend herself. Officer Baird left and shut the door behind him.

A moment later Sheriff Kelsey, and Officers Carpenter, Baird, Kiboloski, Easter, and Rainey assembled outside the cell door. Officer Carpenter entered first and made a motion as if to strike Ms. Sharp with a weapon, but his arm was obstructed by a wall. Two of the officers grabbed her, and together with the other officers, slammed her against the cell wall. They then tossed her to the cell floor. The officers· proceeded to batter her, twist her arms and pull her hair. The officers handcuffed her, pulled her arms high and behind her back, grabbed her by the hair, grabbed her throat in a manner that strangled her, and escorted her to another cell. They moved her from cell to cell in this manner several times, occasionally grinding her face into a wall.

The officers' version of events is taken from depositions. According to Officer Baird's testimony, Ms. Sharp initially accompanied him to a door out of the courtroom without resistance. On the way out the door, or just after passing through the door, she struck him with her briefcase and bolted back into the courtroom where she called to the gallery that someone should call the papers and an attorney. Officer Baird retrieved her by following her back into the courtroom and grabbing her arm. On the way through the door the second time, or after passing through the door, she struck him in the face. A witness testifies in a deposition that he saw Ms. Sharp strike Officer Baird in the back of the head. Officer Baird exclaimed "You're done, lady," secured his grip on her arm, moved her against the far wall of a vestibule located outside the courtrooms, placed his knee and thigh against her back, unlocked and opened the door, and spun her around and into the vestibule. The vestibule is the room immediately before the holding cell, but it is not itself a holding cell. Once inside, Ms. Sharp came toward him clutching a set of keys in her fist with individual keys protruded from between her fingers like prongs, in a manner he had seen in self-defense classes. He pushed her in the chest to get her away from the door.

He then shut and deadbolted the door. Officer Baird maintains that Ms. Sharp did not fall from the push. But she was yelling and screaming during the whole trip from the courtroom to the vestibule.

Officer Baird then called for back-up and the assistance of a female officer. Officer Dan Easter arrived on the scene first. He noticed a scratch on Officer Baird's face, and Officer Baird warned him that Ms. Sharp "still had her keys" and that he should not go into the vestibule. Officer Easter could hear Ms. Sharp's kicking, pounding and "irate" screaming, which included yelling about someone "touching" her breasts. Officer Easter called for assistance from the jail. At the time, court was still in session in both of the courtrooms immediately adjacent to the vestibule in which Ms. Sharp was held.

Officers Randy Carpenter and Steven Kiboloski then arrived. The officers decided that Ms. Sharp would have to be moved because of the disturbance she was creating and because they did not regard the vestibule as a secure area. Officer Baird warned Officers Kiboloski and Carpenter that Ms. Sharp had keys and that "she'll try to take your eyes out." Officers Carpenter and Kiboloski saw that Officer Baird was holding the side of his face. When Officer Baird then took his hand away, they noticed that he had a red scratch that intermittently extended from his eyebrow, across his cheek and down to his neck. Officer Carpenter testified that there was blood on his collar. Officer Kiboloski testified that the scratch was slightly swollen and showed a little blood in some places, but it was not actively bleeding at the time.

Officer Carpenter entered the vestibule first, with Officers Kiboloski and Easter behind him. Ms. Sharp continued to scream and yell. Officer Carpenter reached for his "do-right sticks" [1] and began to take them out of their holster, but determined not to use them because the proximity of a wall would not permit him to use them appropriately. He began talking to Ms. Sharp in a

---

1. "Do Right Sticks" are light pieces of plastic held together by nylon cord. According to Officer Carpenter, they are used to help restrain recalcitrant suspects or inmates by clamping onto the inmate, pressing on the nerves, and more securely holding them than simply grasping with hands.

firm but non-threatening manner to explain to her that they had to take her to jail, and to get her to calm down and surrender the keys. She continued to yell and scream, demanding the press and an attorney and citing to the United States Code.

Officer Carpenter extended an open hand to coax her into calmly surrendering by turning and placing her hands against the wall, but instead she charged him with her keys clutched like prongs in her fist. He grabbed and lifted her arms, and spun her around. He and Ms. Sharp went to the ground, with Ms. Sharp falling rapidly and hard. As Officers Carpenter and Kiboloski attempted to gain control of Ms. Sharp's wrists, she bit Officer Carpenter's forearm. Officer Kiboloski grabbed her head and hair to dislodge her bite. Officers Easter, Baird and Rainey secured her torso and legs or were otherwise involved. Officers Carpenter and Kiboloski were then able to get her handcuffed with her arms behind her back.

Officers Baird and Carpenter then led Ms. Sharp to another floor to be placed in a holding cell. On the way out of the vestibule, Ms. Sharp saw Sheriff Kelsey. When she learned who he was, she informed him that she would sue him. As each officer held her by an arm and walked her away, she faced and walked backwards because it is a position affording the officers more control. On the way to her holding cell, she gathered the names of each of the officers and informed them that she would sue them. After being placed in a holding cell for a short period, the officers decided to move her again because she continued to yell and kick, and the officers were concerned that they could not observe her for her own safety.

The parties agree that at some point she asked to be taken to a hospital where she was observed, treated and spent the night. Ms. Sharp avers that a treating physician found her disoriented, with bruises and a possible closed head injury. In the struggle, her glasses had been bent and a broach crushed. She was later treated by her own physicians for mental and psychological pain. Ms. Sharp was also convicted in state court for resisting police officers in the performance of their duty; but the conviction was vacated and reversed for failure to disclose exculpatory evidence.

Some discovery has commenced in this matter, but further discovery awaits resolution of this motion.

**Standard**

■ Defendants filed this motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56. Under a Rule 12(b)(6) motion, the Court must limit its inquiry to the pleadings. "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment...." Fed.R.Civ.P. 12(b). Because this Court did not limit itself to the pleadings, the motion will be treated as one for summary judgment.

■ In reviewing a motion for summary judgment, this Court should only consider the narrow questions of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The crux of the motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir.1989). A motion for summary judgment requires this Court to view "inferences to be drawn from the underlying facts ... in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). On the other hand, the opponent has the burden to show that a rational trier of fact could find for the non-moving party or that there is a "genuine issue for trial." *Matsushita Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## DISCUSSION

Ms. Sharp and her co-plaintiff husband, Dan Sharp, have filed a three count complaint. In count I, Ms. Sharp alleges that

the defendants' conduct violated her Fourth, Fifth, Eighth and Fourteenth Amendment rights. In count II, she alleges the state tort of intentional infliction of emotional distress. Count III is a state claim by her husband, Dan Sharp, for loss of consortium. Defendants raise primarily immunity arguments on this motion.

**Quasi Judicial Immunity**

■ The complaint contains an extended discussion of the merits of Judge Hocking's judgment of contempt. The defendants raise the defense of quasi-judicial immunity to any claim that they should be held liable for the mere execution of the judge's order. Quasi-judicial immunity is warranted where court personnel act as an arm of a judicial officer who is absolutely immune. *Martin v. Board of County Comm'rs*, 909 F.2d 402, 404 (10th Cir.1990). *Cf. Berger v. Cuyahoga County Bar Assoc.*, 983 F.2d 718, 722 (6th Cir.1993). Judge Hocking is absolutely immune from liability for his judicial orders. *Stump v. Sparkman*, 435 U.S. 349, 355–56, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978). Therefore, the officers are absolutely immune for the mere execution of his order to take Ms. Sharp to jail to serve her sentence. *See Martin*, 909 F.2d at 404. But it does not follow that they are immune for the manner in which they took her to jail. *Id.* at 405.

The summary judgment motion will be granted to the extent the Sharps have attempted to hold the defendants liable for the mere execution of Judge Hocking's order.

**Qualified Immunity**

■ With regard to the manner of handling Ms. Sharp, defendants claim they are entitled to qualified immunity. Qualified immunity extends to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Whether an official "may be held

personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).

■ In the Sixth Circuit, "when a defendant moves for summary judgment based on qualified immunity, the plaintiff must: 1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir.1995); *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987). Necessarily, this Court must determine which constitutional right is at issue.[2]

### *Applicable Law*

Although plaintiff cites the Fourth, Fifth, Eighth and Fourteenth Amendments in her complaint and brief, this Court finds that this is an Eighth Amendment excessive force case.

■ The Fifth Amendment due process clause does not apply to state actors, *Fidelity Financial Corp. v. Fed. Home Loan Bank*, 792 F.2d 1432, 1435 (9th Cir.1986), *Three Rivers Cablevision v. City of Pittsburgh*, 502 F.Supp. 1118, 1134 (W.D.Pa.1980); rather, it is the Fourteenth Amendment due process clause which is applicable to state actors. *See Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But the Fourteenth Amendment does not apply where there is a more specific constitutional provision available. *Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

■ The Fourth Amendment applies to excessive force claims generally arising in

---

**2.** In her brief, but not in her complaint, Ms. Sharp contends she has an equal protection claim in that she was discriminated against because of her sex. To the extent that her brief is an attempt to amend her complaint, the motion is denied as dilatory and futile. There is no evidence or allegation raising an inference that she was victimized "because of" her sex. *See Newell v. Brown*, 981 F.2d 880, 887 (6th Cir. 1992).

the context of an arrest or investigatory stop of a free citizen, and protects against the use of force that is not "objectively reasonable." *Graham,* 490 U.S. at 394, 109 S.Ct. at 1870–71. The Supreme Court has left open the possibility that the Fourth Amendment extends beyond arrest or the *beginning* of pretrial detention. *See Id.* at 395 n. 10, 109 S.Ct. at 1871 n. 10.

 The Eighth Amendment cruel and unusual punishment clause protects against the "unnecessary and wanton infliction of pain." *Graham,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10. This right attaches upon conviction. *Ingraham v. Wright,* 430 U.S. 651, 659–71, 97 S.Ct. 1401, 1406–07, 51 L.Ed.2d 711 (1977). The protections of the Eighth Amendment apply after the State "has secured a formal adjudication of guilt in accordance with due process of law." *Id.* at 671 n. 40, 97 S.Ct. at 1412 n. 40. *See also, Whitley v. Albers,* 475 U.S. 312, 318, 106 S.Ct. 1078, 1083, 89 L.Ed.2d 251 (1986) (reaffirming *Ingraham,* 430 U.S. at 671, 97 S.Ct. at 1412). The Eighth Amendment governs those charged with the custodial care of convicted persons, *id.,* including where the care requires force employed as a security measure. *See Henry v. Perry,* 866 F.2d 657, 659 (3d Cir.1989) (prisoner shot during escape attempt).

 Ms. Sharp was convicted of a crime when Judge Hocking summarily found her guilty of criminal contempt for her contumacious conduct in the courtroom. *See* Exh. C.; *In re Warriner,* 113 Mich.App. 549, 317 N.W.2d 681 (1982), *mod. in part on other grounds* (1982); MCL 600.1715(1). Criminal contempt is a crime like any other in the sense that it is a violation of the law punishable by fine or imprisonment or both. *Bloom v. Illinois,* 391 U.S. 194, 201, 88 S.Ct. 1477, 1481–82, 20 L.Ed.2d 522 (1968). The Supreme Court holds that a summary adjudication of criminal contempt for conduct occurring before a judge affords the contemner due process. *See Fisher v. Pace,* 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569 (1949); *In re Oliver,* 333 U.S. 257, 275, 68 S.Ct. 499, 508–09, 92 L.Ed. 682 (1948). Ms. Sharp passed through the due process clause and on to a conviction and sentence in those few minutes in front of Judge Hocking. *See Fisher,* 336 U.S. at 159, 69 S.Ct. at 427; *In re Oliver,* 333 U.S. at 275, 68 S.Ct. at 508–09; *In re Warriner,* 113 Mich.App. at 554–55, 317 N.W.2d 681. *See also,* Annotation, *Contempt Proceedings and Due Process—Federal Cases,* 93 L.Ed. 578, 583 (1949).

 When Judge Hocking summarily convicted Ms. Sharp of criminal contempt in front of Officer Baird and ordered him to take her to jail, this Court holds that Ms. Sharp was thereafter subject to the protections of the Eighth Amendment and not the Fourth or Fourteenth Amendments. *See Ingraham,* 430 U.S. at 671 n. 40, 97 S.Ct. at 1412 n. 40. *Cf. Berry v. City of Muskogee,* 900 F.2d 1489 (10th Cir.1990) (Eighth Amendment applied to convicts in custody but not yet sentenced). At the moment Judge Hocking completed his order with an officer immediately present, any Fourth Amendment seizure was complete because she was not free to go where she pleased. *See Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1878–79, n. 16, 20 L.Ed.2d 889 (1968). As far as the defendant officers are concerned, Ms. Sharp was never *not* in custody. This Court is not faced with the problem of a convicted person who has escaped custody. *Compare Patterson v. Fuller,* 654 F.Supp. 418, 421 (N.D.Ga.1987) (Fourth Amendment applied to seizure of prisoner who had escaped custody) *with Henry,* 866 F.2d at 659 (Eighth Amendment applied to prisoner who was shot while attempting to escape custody). Ms. Sharp was not a suspect, detainee, or fugitive; she was a convicted person in the custody of Officer Baird and the Eaton County Sheriff's Department.[3]

Because she was a prisoner in the custody of Officer Baird and the Eaton County Sheriff's Department, any treatment she received on the way to a jail cell is governed by the Eighth Amendment. "Claims of excessive force against convicted prisoners should be

---

3. After considered review, this Court can find no special definition of custody for Eighth Amendment purposes. *See Minnesota v. Murphy,* 465 U.S. 420, 430, 104 S.Ct. 1136, 1143–44, 79 L.Ed.2d 409 (1984).

analyzed under the Eighth Amendment and not the [Fourth or] Fourteenth Amendment." *Berry*, 900 F.2d at 1494 (citing *Graham*, 490 U.S. at 394, 109 S.Ct. at 1870–71). *Accord*, *Cornwell v. Dahlberg*, 963 F.2d 912, 915 (6th Cir.1992); *Kinney v. Indiana Youth Center*, 950 F.2d 462, 465 (7th Cir.1991); *Meriwether v. Coughlin*, 879 F.2d 1037 (2d Cir.1989); *Mills v. Smith*, 656 F.2d 337 (8th Cir.1981); *Robles v. Ramos*, 729 F.Supp. 920 (D.P.R. 1989); *Newby v. Serviss*, 590 F.Supp. 591 (W.D.Mich.1984).

### Eighth Amendment Excessive Force

 In order to establish § 1983 liability, the Sharps must demonstrate that the defendants violated clearly established law at the time of the events in question, and that the unlawfulness of their conduct would have been "apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Then, as now, convicted prisoners had a clearly established Eighth Amendment right against the "unnecessary and wanton infliction of pain." *See Hudson v. McMillian*, 503 U.S. 1, 5, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (quoting *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084). *Whitley* holds that, in the excessive force context, whether a particular action by an officer inflicted unnecessary pain and suffering depends upon "whether force was applied in a good faith effort to maintain or restore discipline or 'maliciously and sadistically for the very purpose of causing harm.'" *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Factors to consider in this analysis include: the need for force, the relationship between the need for force and the force applied, any injury inflicted, the threat to the safety of the officers and others "as reasonably perceived by the offic[ers] on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* at 321, 106 S.Ct. at 1085.

The officers have presented sworn testimony supporting their defense that they fully complied with their Eighth Amendment obligations. Their testimony supports their defense that they did not violate clearly established law barring the unnecessary and wanton infliction of pain, or fail to act in a good faith effort to maintain or restore discipline. *See Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1084–85. According to the officers, Ms. Sharp struck Officer Baird twice, employed a weapon to strike at his eyes and face, attempted to escape into the courtroom, screamed and pounded in a manner disrupting the adjoining courtrooms, refused to relinquish her weapon (the keys), refused to accompany them peaceably, lunged at Officer Carpenter with her keys in hand, bit Officer Carpenter's arm, and continued to yell and pound even when restrained and taken to a holding cell. In response, the officers employed progressive means of coercion, which at best resulted in the incidental infliction of pain.

 Because these facts, if true, entitle the officers to qualified immunity, the burden of production shifts back to Ms. Sharp to establish that there is a triable issue of fact. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991). The Sixth Circuit places a heightened evidentiary production standard for plaintiffs facing summary judgment on qualified immunity grounds. *See Veney v. Hogan*, 70 F.3d 917, 922 n. 5 (6th Cir.1995). The Sharps' complaint is not a verified complaint, so Ms. Sharp cannot rest upon it to establish her triable issues of fact. *R.E. Baxter, et al. v. Railway Express Agency, Inc.*, 455 F.2d 693, 696 (6th Cir.), *cert. denied*, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972). For all of its splendid detail, the complaint carries no weight on summary judgment now that the officers have established compliance with clearly established law.

The Court turns to Ms. Sharp's affidavit[4] and the excerpt of state trial testimony provided with the opposition motion. She does not recall bolting back into the courtroom, but she recalls pulling her arm away from Officer Baird's grip. She denies striking Officer Baird with her keys. She testifies that Officer Baird shoved her in the breasts

---

4. The court accepts the affidavit as sufficient for Fed.R.Civ.P. 56 purposes despite the absence of a notary seal. The affidavit "substantially" complies with 28 U.S.C. § 1746(2).

"without provocation", knocking her to the floor where she hit her head against the door to a neighboring courtroom. When Officer Baird pushed her into the vestibule and then came toward her, she raised a fist clenching keys and told Officer Baird that she would defend herself. She then rapped her keys against the window of the door to the vestibule to get someone to pay attention to her demand for the right to contact an attorney. The affidavit establishes that alternatives to the force employed were available because she offered no resistance when the officers entered the vestibule. Despite the absence of resistance when the five officers entered the vestibule, they threw her against a wall, dropped her to the floor, grabbed her head and hair, pulled hard on her arms causing pain when they handcuffed her, smashed her head and face into the walls when moving her, and teased and taunted her. Ms. Sharp's affidavit adds that she continued to be mistreated as she was transported from one place to another and that she has sustained significant injuries.

Because of its lack of specificity regarding her own conduct or the conduct of specific officers, this Court questions whether Ms. Sharp's affidavit and testimony meet the heightened production standard on summary judgment now required by the Sixth Circuit. *See Veney,* 70 F.3d at 922 n. 5. Ms. Sharp, however, did not have the benefit of *Veney* when she filed the affidavit, all the officers admit they were participants, and the officers have not presented evidence refuting the existence of serious injury. Accepting, as this Court must, that what Ms. Sharp says on this motion is true, the Court finds that the affidavit and testimony sufficiently create issues of fact regarding the two versions of events. Under her version, no force was necessary, a lot of force was applied, the officers joked about it, and she suffered significant injury. She has established a violation of the Eighth Amendment as the law on unnecessary, malicious and wanton infliction of pain stands today. *See Hudson,* 503 U.S. at 5, 112 S.Ct. at 998. Of course, the question of qualified immunity turns on the objective reasonableness of the officers at the time of the events.

With regard to the unprovoked shove in the breasts by Officer Baird, it was not clearly established law in 1991 that a single unprovoked attack by a prison guard on an inmate violated the Eighth Amendment. *See Pelfrey v. Chambers,* 43 F.3d 1034, 1036 (6th Cir.1995) (discussing *Glick,* 481 F.2d at 1032 and *George v. Evans,* 633 F.2d 413 (5th Cir. 1980)). A single, unprovoked attack was not clearly considered punishment because such an attack was not authorized and served no penal or disciplinary purpose. *See Id.* at 1039 (Batchelder, dissenting). This kind of action was considered a state tort. *See Id.* (and authorities cited). Standing alone, this conduct would not state a claim. *See Id.*

 However, Ms. Sharp testifies to a series of assaultive events following the first shove that each officer could have mitigated. Issues of fact remain with regard to whether Sheriff Kelsey directed or knowingly acquiesced in the exercise of excessive force. The severity of the harm remains an issue of fact. Accordingly, Ms. Sharp has established a violation of her right to be free of cruel and unusual punishment as the law stood in 1991. *See McHenry v. Chadwick,* 896 F.2d 184 (6th Cir.1990); *Parrish v. Johnson,* 800 F.2d 600 (6th Cir.1986); *Glick,* 481 F.2d at 1032. Furthermore, it would have been apparent to an objectively reasonable officer in 1991 that *a series* of beatings in the course of securing and then transferring *a cooperative* prisoner violated the Eighth Amendment. *See McHenry,* 896 F.2d at 186; *Glick,* 481 F.2d at 1032.

**Sheriff Kelsey**

The Sharps raise three theories for holding Sheriff Kelsey liable: failure to train Officer Baird in how to secure a prisoner; "gross negligence" in the retention of Officer Baird; directing or knowingly acquiescing in his subordinates' unconstitutional assault upon Ms. Sharp. Sheriff Kelsey has been sued in his official and individual capacity, and moves to dismiss the claims.

 A failure to train claim cannot be founded on the unsatisfactory training of a particular officer. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 390–91, 109 S.Ct. 1197, 1205–06, 103 L.Ed.2d 412 (1989);

*Walker v. Norris,* 917 F.2d 1449, 1456 (6th Cir.1990). Because the Sharps do not allege that anyone other than Officer Baird was improperly trained, this claim must be dismissed.

█ *Nishiyama v. Dickson County, Tenn.,* 814 F.2d 277 (6th Cir.1987), is no longer good law with regard to whether "gross negligence" establishes a substantive due process claim for certain breaches of duty toward those bearing a special relationship to the state. *See Foy v. City of Berea,* 58 F.3d 227, 230–31 (6th Cir.1996) (substantive due process has been redefined and special relationship has been redefined as custody). *See also, Lewellen v. Metropolitan Government of Nashville, Tennessee,* 34 F.3d 345, 351 (6th Cir.1994) (plaintiff must allege, and defendant must engage in, arbitrary conduct intentionally designed to punish). However, the Sixth Circuit has pointed-out that the Supreme Court left open the possibility that deliberate indifference may be an alternative to respondeat superior liability. *See Lewellen,* 34 F.3d at 350–351 (discussing *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Because *Nishiyama* has not been overruled, *Foy,* 58 F.3d at 230, this Court holds that such an alternative theory exists on the facts of this case which involve a custodial setting.

To employ the alternative theory, a plaintiff must show a constitutional injury and then show deliberate indifference. *See Lewellen,* 34 F.3d at 350–51. Ms. Sharp adequately alleges and creates issues of fact regarding excessive force by Officer Baird. In *Farmer v. Brennan,* —— U.S. ——, ——, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811, 825 (1994), the Supreme Court held that a prisoner alleging a deliberate indifference claim must show that the official, here Sheriff Kelsey, is "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Thus, in *Farmer,* the Supreme Court ultimately set forth a subjective test. *Id.* at ——, 114 S.Ct. at 1978–79, 128 L.Ed.2d at 825; *Medley v. Turner,* 869 F.Supp. 567, 575 (N.D.Ill.1994). The Sharps have sufficiently set-forth facts for this element for Rule 12(b)(6) purposes by alleging

that Sheriff Kelsey had been exposed to complaints from inmates, arrestees, fellow officers and superior officers regarding Officer Baird's excessive tendencies. *See Farmer,* —— U.S. at —— – ——, 114 S.Ct. at 1981–82, 128 L.Ed.2d at 828–29. *Cf. also, Hays v. Jefferson County, Ky.,* 668 F.2d 869, 877 (6th Cir.1982) (Merritt, J., dissenting) (arguing for higher standard of deliberate indifference than majority). Whether the claim will survive full discovery is another matter.

█ Sheriff Kelsey may also be liable as an individual for the constitutional torts of his subordinates if he "implicitly authorized, approved or knowingly acquiesced in the [specific incident of] unconstitutional conduct." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984) (cited in *Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994)). Based on a reading of the complaint and pleadings, plaintiff's have sufficiently alleged that Sheriff Kelsey was present, or knew of the impending incident, and that he had an opportunity to intervene.

## State Claims

█ Ms. Sharp alleges a claim of intentional infliction of emotional distress under Michigan law. *See Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 374 N.W.2d 905 (1985). Mr. Sharp has alleged a derivative loss of society claim. Defendants contend that this Court should dismiss the claims for lack of jurisdiction or merit because they are entitled to qualified immunity on the underlying federal counts. In light of the disputed issues of fact regarding the immunity issues, this Court must decline to do so.

## CONCLUSION

Defendants' motion can be granted only in part. All of the defendants are entitled to judgment on the Fourth Amendment claims of excessive force or unlawful seizure. The officer defendants are not entitled to judgment on the Eighth Amendment claim because of disputed issues of fact. Sheriff Kelsey is entitled to judgment on the failure to train claim; but he is not entitled to judgment on the deliberate indifference/supervi-

sory liability claim. The Fourteenth Amendment is not at issue here. Because some federal claims remain, the Court will continue to entertain jurisdiction over the state claims.